Our next case for argument is XMission v. Fluent. Thank you, Your Honors, and may it please the Court. Counsel. I'd like to try to reserve two minutes for a vote. Your time is your own. My name is Dick Baldwin. I'm here representing Appellants XMission. This case involves a company whose business model is premised on the idea of conducting business in all jurisdictions, but they also structure their conduct in a way where they attempt to launder their activities, so to speak, by working through third parties that provides them with plausible deniability about where any of their activity is actually being directed. Based upon that deniability or the ignorance of where their activity is being directed, Fluent then argues that they cannot be subject to specific jurisdiction based upon their business activities. Indeed, in this case, it seems that the position leads to the necessary conclusion that Fluent can engage in these widespread, expansive online marketing campaigns and be subject to specific jurisdiction nowhere, and instead could only be subject to general jurisdiction. They don't initiate the publication of the Internet transmissions that are at issue, right? There are third parties that are sending out these publications. Correct. They work with third party publishers who have incentives. Well, their agreements are structured in a way where Fluent provides some information that provides the content for these emails. And does Fluent direct these third parties where to send these publications? Not specifically to any particular place, no. What they do is they create incentives based upon certain triggering actions where the third party is only compensated based upon an end consumer completing a survey or clicking on an email. Well, don't we need that targeting that's discussed in the briefs by Fluent? In a sense, well, yes, we do. I mean, what you're describing is Fluent creates this material and third parties use it and send it out wherever the third parties want to send it. In a sense, yes, although the way that due process personal jurisdiction analysis has been described, the two poles are that a party must purposefully direct their activity such that they can reasonably anticipate being hailed into court in that jurisdiction. Or, on the other hand, personal jurisdiction is not appropriate where their contacts with that forum are so attenuated or fortuitous that it would be unreasonable to bring them into that jurisdiction. And some tension that exists or a difficulty with these cases, especially in the Internet context, is how one party's conduct can be intertwined with another party's conduct. And certainly this court in the Supreme Court has clearly stated that the unilateral activity of a third party cannot form the basis for jurisdiction. For example, in Worldwide Volkswagen, where a purchaser of a vehicle drives the car from New York to Oklahoma, the incident in Oklahoma was attenuated or purely fortuitous contact with that forum. Here, it's harder to say that it's truly that fortuitous or attenuated. The purpose, the rational business motive here for both companies is for the contacts to reach every jurisdiction. That's exactly the same thing that happened in Jay McIntyre, is it not? The manufacturer has a distributor who sells this product all over the country, and the Supreme Court said that's not enough to subject the manufacturer to specific jurisdiction. How do you distinguish Jay McIntyre? I'm not sure I'm prepared to address Jay McIntyre. I'm not entirely up to speed on that case. The foreign corporation manufactured the machine. It sold the machines to a distributor with a nationwide distribution system. That might lead those products to being, I'm quoting from the court, being sold in any of the 50 states. And certainly when you deal with a distributor, you want that distributor to sell as many as possible, just as you're saying Fluent wants its publishers to publish this as far as possible. But in Jay McIntyre, the Supreme Court said there's not specific jurisdiction here. Well, here, this seems very similar to me. The specifics of this case provide a slightly narrower way of reaching the same result. What I've been sort of reaching at is, I think, a larger acknowledgement of the Internet context of online marketing companies that are spamming and reaching into every jurisdiction but purporting to not know that they're reaching into those jurisdictions. A more narrow ground that maybe addresses your point better is that in this specific case, the lack or that plausible deniability that their business structure has created is no longer plausible when they are both asserting adamantly that they conduct no business, have no connections whatsoever with a certain forum, but nonetheless also generate revenue from that forum. Now, how do you know that? I was very interested where you got this figure. How did you determine that Fluent collected so much money from Utah residents? The evidence itself came from Fluent's general counsel in his declaration, describing at length all of the reasons or the explanation for how Fluent has no connection to Utah as a forum and then followed it on with saying that it only collects a small amount of its revenue, only 0.9 percent of its revenue from the forum. And where did it collect that? How did it collect that revenue? Was it from this particular operation? I don't see how Fluent gets any money from anyone in Utah from the operations that you're complaining about. What it gets out of Utah is information about residents, which it might be able to market someplace else, but where do you – how does the activity, these improper publications, as you described them, how does that lead to money from Utah coming to Fluent? Admittedly, it may not, but based on the light burden at the prima facie standard at this stage of the proceedings, the only evidence in the record requires – or the only possible conclusion that can be reached is that that has to be where that money is coming from. You haven't complained about lack of discovery at this stage of the proceedings, have you? No, we aren't raising that now. So you had opportunity to conduct discovery to establish personal jurisdiction. So I don't think you can say at this stage we don't know enough and we should be allowed to develop that evidence later. This is the point to show how they're getting this money out of Utah, isn't it? Agreed, and to clarify, my reference to jurisdictional discovery did not mean that in light of our unawareness of that fact we should be allowed to proceed. It's that I'm acknowledging that conceptually you're right. It may prove that once we have more information, once the record has been more fully developed, the facts that are in the record currently look different once there's discovery. You have to show that this is specific jurisdiction. You have to show that this money they're getting out of Utah – if you're basing it on market penetration or whatever the term is – I'm sorry, I forgot the technical term. If your point is that there's specific jurisdiction based on that, you have to show that their sales, their source of income from Utah, is connected directly to the improper conduct that you're suing about. And I think General Counsel's affidavit makes it clear that there's no other possible basis for that revenue. Well, I can't see any possible basis for it because the activity you're talking about does not in itself generate money. It certainly does. The emails to Utah are to get information from people. Once they click on the email and enter some information, that's when the publishers get reimbursed. And then Fluent uses that information somehow – I don't know how because that's not described – to make money. But how it gets money from Utah – maybe there's a manufacturer in Utah who uses this information about people to sell their products to people in Utah and Fluent gets a cut of that. I don't know, but you haven't shown any connection. We have. The record reflects that Fluent's business model is that they provide targeted consumer data. And so information that they receive from these emails would be the type of data that a Utah company would be looking for. And so the connection between revenue that would come from Utah, from someone purchasing consumer data in Utah, would be from the Utah consumers that these emails are reaching. In other words, you're looking at the business. You could have lots of kinds of business. You could sell into a state, like selling a car. Or you could be extracting things from the state, like mining gold from a state. And so you're saying that the business here of Fluent was to go into Utah and extract gold, to market, to gain in Utah a valuable resource in Utah – that is, the names of these customers – and then go out and market it elsewhere. And do you have any evidence in the record of how many names of people in Utah they got? No, but we know that just our ISP, which isn't certainly all of the Internet service providers in Utah, alone received 10,000 of these emails. Yeah, but you don't know how many people clicked on it. You don't know how much information was mined out of Utah. I think Judge Ebell's analogy is a good one, but you don't have any evidence of that either. We have evidence. We don't have a certainty about that, and that would certainly be the subject of the liability case. What evidence do you have? You know that there were emails sent to people in Utah. We don't know, of those 10,000 people who got emails, if any provided information to Fluent. Well, we know that Fluent was able to generate revenue from the state. Well, no, it might have generated the revenue by selling to a Utah company information about customers in Pennsylvania who clicked on it. We don't know that because you haven't explained where that money from Utah arose. I understand the point you're making. The general counsel's declaration goes to great lengths to disclaim precisely that notion, that Utah is a jurisdiction where Fluent is involved in those sorts of activities. What does that mean, those sorts of activities? Of business activities generally. He says that none of their business activities occur in Utah. They've never been registered to do business in Utah. They've never had any offices of any kind in Utah. They've never employed any persons in Utah. They've never owned or leased commercial property. They've never had any assets in Utah. They have no telephone there. They've never undertaken to market or advertise in Utah or to target or direct any Internet marketing directly to Utah residents. Those sorts of statements are in direct tension with the idea that they are nonetheless generating revenue in that state. So that precludes every other source of revenue, that is, at least from their own activity. On this record, yes. There's no other conclusion that can be drawn. Wasn't there some evidence in the record that the individuals identified by this third-party publisher, when that information went to Fluent, it contained Utah addresses? So that when they're giving Utah these contacts, I mean, when they're giving Ex-Mission these contents, when Fluent is getting this contact, rather, Fluent knows that a lot of the data they're getting, a lot of the stuff they're getting, is from Utah. Is that right? Yes, I believe that's correct. Well, they know that, but you don't know it. There's no evidence in the record of how much that happened. Yes, if someone clicks on the emails that are sent and provides private information, personal information, that goes to Fluent, Fluent reimburses the publisher for that, and Fluent knows it's got names of people in Utah. But we don't know how often that happens. You have no data on that. I don't think the standard requires us to know how often it happens. If it happened once or twice, that would not be enough contact for specific jurisdiction. Agreed. I don't think once or twice would get you to 0.9% of the revenue, which is roughly $3 million. But you haven't connected the revenue to the emails going into Utah. I would think that a Utah business, if Fluent has 100,000 names from New England, a company in Utah might pay for that information, and that shows they're getting money from Utah. But you haven't connected that money from Utah with the activity that you're challenging in this lawsuit. That's not what his declaration says. He says that Fluent generates almost no revenue, less than 0.9% from Utah customers. Yes. It's not someone from Pennsylvania buying this. I've said it repeatedly. I see I'm nearly out of time, so I'll conclude by just saying that, again, it seems that Fluent's position here, taken to its logical extreme, extends the Due Process Clause far beyond what it was intended here, and is effectively attempting to avoid specific jurisdiction in any form in the country, and instead only permit itself to be subject to general jurisdiction, which we would respectfully submit as incorrect, and we request that you reverse the district court. Thank you. Thank you. Good morning, and may it please the Court. My name is Derek Newman. I represent Fluent. Ex-mission can't meet either requirement of the two-part specific jurisdiction test. First, ex-mission can't show that Fluent purposefully directed activity at Utah, the forum state. Purposeful direction can be seen under three frameworks. Ex-mission argues only the market exploitation framework, and that requires continuous and deliberate exploitation of the forum state market. On purposefully directed, I'm intrigued about this national concept, that if you are seeking a national distribution of something, the argument is you don't need to prove that, yeah, I said I'd like Utah. Yeah, I said I'd like Wyoming. Yeah, I said I'd like Hawaii. It's enough just to say I want you to do it as broadly as you can, and that could be national, without being specific by state. What is your response to that kind of a national big picture rather than the composite of the individual state little picture? Your Honor, this court in Old Republic v. Continental Motors looked at what facts would qualify as market exploitation, and one was a case where the defendant generated 10,000 to 15,000 sales each month,  In another case, the defendant generated hundreds of thousands of customers on products that we know were advertised in the forum state. Those facts aren't present here. We have nothing in the record that indicates that Fluent generated any sales. What Fluent did is engage publishers and advertise with those publishers. The publishers then sent email containing Fluent's emails to the publishers' own customers. The publishers addressed the emails. The publishers used the publishers' own distribution lists. The publishers clicked send. The publishers created the headers and the footers. And so where does the Utah revenue come from? Your Honor, two responses. First, the record is unclear. Even an inference can't be drawn. Second, I'll answer the question. Fluent generates revenue from advertisers. It's in the business of connecting consumers with advertisers, and less than 0.9% of the revenue it generates are from advertisers located in Utah. But that's been pointed out, if you have a national market position, as very close to Utah's precise population nationally. I agree that one or two isolated events isn't going to establish it. You sell a truck and the truck randomly gets driven to a state you didn't contemplate, and there's an accident. That's one thing. But here you've got 9 tenths of 1%, which is pretty much Utah's population nationally. So why is that so dismissive in your opinion? This case is a specific jurisdiction case, Judge Ebell. And so we look at whether the defendant purposefully directed activity at the forum state. I certainly agree wholeheartedly with what you've just said. But my question is, if you're looking at a national jurisdiction, why isn't evidence that you develop that state's equivalent national percentage of revenue as sufficient to say there was a purposeful commitment by this country, company, to do national business, and therefore has purposefully agreed to submit to national service or process? That fact might be relevant for general jurisdiction, but here we look at the alleged injury and whether it arose out of fluent, purposeful direction at the state of Utah. Well, we know the injury arose out of Utah because that is what Ex Mission is saying. So that part is satisfied. But my question is the other side, the purposeful side. And I'm struggling with this concept of whether you need state-by-state purposefulness if you have an inference that could be drawn that there's a national purpose. Your Honor, fluent advertise with publishers who send e-mail. And by definition, e-mail is stateless. It can be retrieved from anywhere on the planet. Ex Mission could have retrieved these on servers in New York or Australia. And while they did retrieve them on servers located in Utah, the inquiry is not of the plaintiff. We look at the defendant's conduct and whether the defendant purposefully directed activity at the forum state. Is there any evidence in the record that the publishers knew where the recipients of these e-mails resided? There is not, Your Honor. There's nothing in the record that indicates that even the publishers knew where the recipients resided. Now, these are the publishers' own customers. It's feasible that the publisher knew. But even if customers may have resided in Utah, again, e-mail, by definition, is stateless. It can be retrieved from anywhere. But they were getting, in response to these publications, they were getting specific responses from people with Utah addresses. So everybody would have known that somehow or other this was penetrating Utah, would they not? That's incorrect, Your Honor. Nothing in the record indicates that a single consumer opened any of these e-mails. That fluent generated a single click. All that we know is- From people in Utah, people who resided in Utah. That's correct, Your Honor. And what I'm speaking of is we have an allegation that Ex-Mission received e-mails with misleading headers and missing address fields. We know Utah did. They received them, that Utah customers received, Utah residents, I won't call them customers, Utah residents received those e-mails and responded. That's incorrect, Your Honor. The record does not support that any Utah residents received any e-mails. We know that Ex-Mission's server retrieved e-mails from Utah, could have retrieved e-mails from anywhere. We have nothing in the record indicating that a single consumer was exposed to any e-mails, clicked on any e-mails, transmitted any data. So when Ex-Mission gets something that comes into them that says, yeah, I'd be interested in this product, and that shows a Utah customer. There's no link back to anything that Fluent may have done. I mean, it's not in the chain of messages or anything that would link that customer's response back to Fluent. Is that right? Theoretically, Your Honor. If Fluent received a click from somebody in Utah, and that consumer entered information indicating it was from Utah, I suppose that theoretically Fluent could find that information. But I say theoretically because that doesn't exist in this record. What exists in this record. But, I mean, isn't it just normal that if you get an e-mail message from somebody saying, hey, here's a good product, and you click back, yes, I'm interested in it. And we know that that yes, I'm interested ended up back at the Fluent. Wouldn't there be a knowledge from Fluent that we could look at that chain and figure out which of our publishers generated that contact? We'd have to, well, yes or no? Perhaps, Your Honor, but I think we're looking at it backwards. We need to look at what Fluent did to purposefully direct activity to the state. Instead, that hypothetical looks to what Fluent did after it received a click on an e-mail. And at that point, the personal jurisdiction inquiry isn't relevant because we look at what Fluent did to direct activity to Utah. Here, Fluent advertised in e-mails that very much likely could have reached Utah or could have reached elsewhere. It could have reached one state or another state. It could have reached just half the states in the United States or none at all because that's how e-mail works. Fluent didn't have the e-mail list, and even if it did, that list doesn't indicate where e-mails would be retrieved. So Fluent didn't purposefully direct any activity at the state of Utah. And the second requirement that Exmission fails to meet is the requirement that the plaintiff's injuries arise out of the defendant's form-related activities. Exmission's alleged injury is receiving an e-mail with a misleading header or missing address field. Fluent is not responsible for headers or address fields. In fact, Fluent had no ability to control the header or the address field. That was totally within the control of the publisher. Were the publishers, any publishers sued here ever or just Fluent? The publishers were sued and ultimately dismissed at Exmission's discretion. Now Exmission points out that Fluent's activities could be intertwined with the publisher. And what that is is a misreading of the Supreme Court's Walden v. Fiore case where the Supreme Court notes that a defendant's conduct may be intertwined with a third party like here the publisher or with the plaintiff, but nonetheless we look at the defendant himself and not his relationship to the third party. So while Fluent may ultimately be found liable because his conduct is intertwined with the plaintiff in a court that properly has jurisdiction over it, for purposes of jurisdiction we do not look to the relationship with the publisher. We look to only Fluent's conduct. And that's from the Supreme Court's Walden v. Fiore case. What was that Martin v. Floyd case? Just give me the name of that case again. The case is Walden v. Fiore. It's a 2014 United States Supreme Court case. It is the most recent in setting forth the personal jurisdiction standard. Is it in your briefing? Of course it is. Walden v. Fiore is the key case because it's the Supreme Court. And I would suggest that the other key case that I hope the court will review is Old Republic v. Continental Motors, 877F3-895, and that is the Tenth Circuit's review of personal jurisdiction after Walden v. Fiore. If you're citing to us an inoral argument, any case you've not cited to us in your briefing, if you give us a 28-J letter, I know you've cited Old Republic. Yes, Your Honor. Exommission asks this court to resolve an issue that this circuit and the Supreme Court have already resolved. Exommission suggests that this court should answer the question, if a defendant, quote, has reason to know, end quote, that it will cause harm in the state, is that defendant subject to jurisdiction in that state? Well, this court in Old Republic and the Supreme Court in Walden noted that if a defendant foresees that its conduct will cause harm in the state, that fact standing alone is an insufficient basis for personal jurisdiction. And when Exommission asks this court to consider whether a defendant, quote, has reason to know, end quote, that its conduct will cause harm, Exommission is merely asking this court to determine if a defendant foresees its conduct will cause harm. Is it subject to jurisdiction? And this circuit and the Supreme Court have answered that question in the negative. So, to review, Exommission hasn't shown that Fluent purposefully directed any activity at the forum state. It placed advertisements that could have been retrieved from anywhere on the planet. There was no intentional targeting of Utah, which was required. And the injuries, the receipt of emails with headers and footers that didn't comply with the law, that doesn't arise out of Fluent's activities. It certainly doesn't arise out of Fluent's forum-related activities. And the issue that's being presented here today has already been addressed in the negative. And so this court should affirm. Old Republic gives, it seems to me, an alternative ground for specific jurisdiction. If there's market exploitation. And that's why I was asking about the evidence in the record about what sort of exploitation there was. And I suspect if they had conducted more discovery, they might have had enough to establish market exploitation, but there's nothing in the record here to satisfy the Old Dominion market exploitation test. Do you acknowledge that that's an alternative to what was said in Walden? Yes, Your Honor. And both the record doesn't show any market exploitation whatsoever. And I'd go a step further, knowing my client, that if jurisdictional discovery was done, none would have been found. And because there was no purposeful direction at Utah, and the injuries do not arise out of Fluent's forum-related activities, this court should affirm. Thank you. Thank you. Thank you both for your arguments this morning. The case is submitted.